UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| **VIBRON LLOYD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | ) Case No. 22-cv-1010-JBM |
| | ) |
| **WEXFORD HEALTH SOURCES, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## MERIT REVIEW ORDER – SECOND AMENDED COMPLAINT

Plaintiff, proceeding *pro se* and incarcerated at Illinois River Correctional Center ("Illinois River"), pursues an action under 42 U.S.C. § 1983 against Defendant Wexford Health Sources, Inc. ("Wexford"). The case is before the Court for a merit review of Plaintiff's Second Amended Complaint pursuant to 28 U.S.C. § 1915A. (Doc. 10). In reviewing the complaint, the Court accepts the factual allegations as true, liberally construing them in Plaintiff's favor. *Turley v. Rednour*, 729 F.3d 645, 649-51 (7th Cir. 2013). However, conclusory statements and labels are insufficient. Enough facts must be provided to "state a claim for relief that is plausible on its face." *Alexander v. United States*, 721 F.3d 418, 422 (7th Cir. 2013) (citation and internal quotation marks omitted). While the pleading standard does not require "detailed factual allegations," it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Wilson v. Ryker*, 451 Fed. Appx. 588, 589 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### FACTS

Plaintiff alleges that Defendant Wexford is liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), based on its allegedly unconstitutional policies, practices, or customs to delay medical treatment and to understaff the healthcare unit at Illinois River.

1

Plaintiff states that he has experienced unbearable grief after his son and brother died. When Plaintiff received the news that his brother had been shot on August 28, 2021, he "went into a psychotic frenzy" and violently banged his head and fists against his cell door, injuring his forehead, knuckles, and fingers. (Doc. 10 at 6). Plaintiff requested emergency medical assistance, a crisis team, and mental health and nurse sick calls. An unnamed officer allegedly told Plaintiff that he would sign him up for sick call, but the officer declined to call for emergency medical assistance or a crisis team because it was "count time" and not an emergency.

Plaintiff claims that he waited for two days for an appointment, but he was not called to the healthcare unit. When Plaintiff was seen for his daily insulin medication, he asked to see medical and/or mental health staff, but the nurse administering his medication allegedly told him to sign up for sick call and talk to his "wing officer" when he returned to his unit. Plaintiff complied and signed up for sick call with wing officer Marter. He also drafted a request slip to Warden Tiffany Clark.

A week after his episode, Plaintiff asked nursing staff why he still had not been seen for the injuries to his head and hands. He was allegedly told that "nursing staff was short" and his request may not have been processed due to a "back-log." *Id.* at 8.

On September 5, 2021, Plaintiff drafted another request slip for mental healthcare and asked the officer who oversaw his wing to sign him up for nurse sick call. When Plaintiff followed up with the officer five days later, the officer allegedly told Plaintiff that he forgot to sign him up. Plaintiff again requested a nurse sick call on September 10, 2021.

Plaintiff alleges that he was finally seen on October 2021. By that time, his injuries had healed and he felt only minimal pain in his hands. Plaintiff told the nurses in the healthcare unit

that "their (Wexford's) procedure for being placed on nurse sick call to receive healthcare is not effective, and that they needed to hire more nursing and mental health staff." *Id.* at 8.

Plaintiff states that he submitted additional requests for mental healthcare on October 6, 2021, November 7, 2021, and November 12, 2021.

Plaintiff next alleges that he became sad as the holidays approached. As a result, Plaintiff "went into a psychotic frenzy" again and banged his fists and head on the cell door so hard that he allegedly jammed some of his fingers and lost consciousness. *Id.* at 9. When he regained consciousness, he frantically began pressing the emergency button in his cell but there was no answer. Plaintiff yelled to an officer and demanded to know why no one had responded. Upon seeing Plaintiff's injured forehead, the officer asked if Plaintiff had been fighting with his roommate, but Plaintiff told the officer that "he was losing his sanity because of his grief and did it to himself." *Id.* at 10. He also told the officer that he was in pain, dizzy, and might have a concussion. The officer warned Plaintiff that if he called for emergency assistance, he could be taken to segregation for fighting with his cellmate because no one would believe that Plaintiff had injured himself. To avoid being taken to segregation, Plaintiff asked the officer to sign him up for sick call instead.

When Plaintiff received his daily insulin medication on November 24, 2021, a nurse noticed his injuries and asked what had happened. Plaintiff told the nurse that he might have a concussion. The nurse told Plaintiff to sign up for nurse sick call because he could not be assessed or receive pain medication unless he was on the list. Plaintiff asked his wing officer to be placed on sick call, but Plaintiff claims that he never received medical care.

Plaintiff submitted request slips for mental health sick call to the Warden on November 30, 2021, December 6, 8, 17, 20, and 28, 2021, and multiple occasions in 2022. He alleges that he received some call passes to be seen, but then the passes were cancelled.

Plaintiff alleges that his injuries were not treated until he had healed. He claims that he was even denied Band-Aids because he was not on the nurse sick call list. Instead, he was told to wash his hands with soap and to dry them with a clean towel.

Regarding his request for mental health care, Plaintiff states that he was called to attend mental health classes with a dozen other inmates but received little individual attention or medication, even though his medical file reflected that he was on medication in the past.

Plaintiff alleges that Defendant Wexford is liable under *Monell* because of its widespread practices that are so permanent and well-settled as to constitute a custom or usage with the force of law, namely, the practice of not screening, assessing, or assisting an inmate with any healthcare needs unless the inmate first speaks with the housing unit officer to sign up for nurse sick call. Plaintiff claims that inmates cannot obtain healthcare any other way because request slips are ignored. Plaintiff alleges that this custom amounts to deliberate indifference to a serious medical need and creates a serious risk of harm for inmates with mental health needs.

In addition, Plaintiff alleges that Defendant Wexford deliberately understaffs the medical unit at Illinois River to save money. Plaintiff states that Wexford has cut staff and forced mental health professionals to have groups of up to 20 inmates or more during one session, which causes the needs of individuals with serious mental health conditions to go unmet. Consequently, Plaintiff claims that he was unable to be assessed by a psychiatrist or speak to anyone individually about his brother.

## ANALYSIS

Private corporations such as Wexford have potential liability under *Monell* if they perform a governmental function and, in doing so, injure the plaintiff through an unconstitutional policy or practice. *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (applying municipal liability to private corporations performing governmental functions). "To establish liability against Wexford under § 1983, Plaintiff must first establish that his constitutional rights were violated." *Dolis v. Loftus*, No. 08- 2085, 2011 WL 978916, at *13 (C.D. Ill. Mar. 17, 2011) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). "Liability may be based on (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policy making authority." *Taylor v. Wexford Health Sources, Inc.*, No.15-5190, 2016 WL 3227310, at *4 (N.D. Ill. June 13, 2016) (citing *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000)). In the instances where *Monell* claims may proceed with conclusory allegations of a policy or practice, some supporting facts must be pled to allow a reasonable inference that the alleged policy or practice exists sufficient to put the defendant on notice of the alleged wrongdoing. *Taylor*, 2016 WL 3227310, at *4; *see also McCauley v. City of Chicago*, 671 F.3d 611, 617-18 (7th Cir. 2011).

Here, Plaintiff does not identify an express policy or the particulars of an express policy. He asserts that Wexford has a custom of not providing healthcare to inmates unless they have first spoken with their housing unit officer to sign up for nurse sick call and that Wexford deliberately understaffs its medical unit and mental health staff to save money. As a result, the Court views Plaintiff's complaint as asserting that Wexford allowed a custom of unconstitutional conduct by

its employees. "To establish 'custom' for § 1983 purposes, the plaintiff must show 'a widespread practice that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom.'" *Dolis*, 2011 WL 978916, at *13 (quoting *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008)). To successfully plead liability based on custom, a plaintiff must allege that the corporate policymakers were "aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

Plaintiff attempts to illustrate three potential risks Wexford's purported custom creates: (1) the officer might forget to sign an inmate up for sick call; (2) the officer might not like an inmate and deliberately refuse to sign him up for sick call; or (3) the officer might be "outright lazy or having a bad day and doesn't feel like filling out the proper paperwork." (Doc. 10 at 13). Plaintiff argues that he experienced the first and second scenarios and claims that medical care was either delayed or denied five times based on an officer's decision. However, Plaintiff offers no allegations to show that this so-called policy, practice, or custom exists, apart from the record of his own treatment. *See Gaston v. Ghosh*, No. 11-6612, 2017 WL 5891042, at *14 (N.D. Ill. Nov. 28, 2017) (finding that three instances, standing alone, do not amount to a policy, custom, or practice under the *Monell* standard). Plaintiff does not claim that a significant number of other inmates have experienced similar difficulties obtaining nurse and mental health sick calls. *See id.* (plaintiff's allegations as to his own treatment were insufficient to establish a policy) (citing *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) (isolated incidents did not add up to a pattern of behavior that would support an inference of a custom or policy).

Finally, Plaintiff's allegations regarding a staffing shortage do not amount to a policy, practice, or custom. *See Olive v. Wexford Corp.*, 494 Fed. Appx. 671, 672-73 (7th Cir. 2012) (bare

6

allegations that Wexford had an unconstitutional policy or practice, "does not identify any concrete policy, let alone an unconstitutional one."). Plaintiff fails to identify any particular policy related to understaffing and, even if such a policy existed, he fails to plead that Wexford was aware of any inadequate care.

The Court finds that Plaintiff has failed to state a claim against Wexford pursuant to Federal Rule of Civil Procedure 12(b)(6) and 28 U.S.C. § 1915A. In its prior Merit Review Order, the Court gave Plaintiff leave to file a Second Amended Complaint but warned Plaintiff it would be his final opportunity to amend his complaint. (Doc. 8 at 6). This is now Plaintiff's third attempt to plead a federal claim, and he has been unable to do so. Therefore, Wexford is DISMISSED with prejudice. This case is now closed.

**IT IS THEREFORE ORDERED:**

1) The Court DISMISSES Plaintiff's Second Amended Complaint [10] with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) and 28 U.S.C. § 1915A for failure to state a federal claim upon which relief can be granted. The Clerk is DIRECTED to enter a judgment under Fed. R. Civ. P. 58.

2) This dismissal shall count as one of Plaintiff's three allotted strikes pursuant to 28 U.S.C. § 1915(g). The Clerk of Court is directed to record this strike in the three-strike log.

3) Plaintiff's Motion in Compliance [11] and Motion for Status [12] are MOOT.

4) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* MUST identify the issues Plaintiff will present on appeal to assist the Court in determining whether the appeal is taken in good faith. *See*

Fed. R. App. P. 24(a)(1)(c); *see also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (stating that an appellant should be allowed to submit a statement of the grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith"); *Walker v O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good-faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED:  10/7/2022

s/ Joe Billy McDade  
Joe Billy McDade  
United States District Judge